IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JAMES E. BONNETT,

   Plaintiff,

v.

COMMISSIONER OF CORRECTIONS-MD,
DEPARTMENT OF CORRECTIONS, MD,
WARDEN WCI,
MEDICAL DEPT. WCI,

   Defendants.

Civil Action No.: PWG-20-3529

**MEMORANDUM OPINION**

Plaintiff James Bonnett filed this civil rights action seeking injunctive relief in connection with conditions at Western Correctional Institution ("WCI") where he is incarcerated. Compl., ECF No. 1; Mots., ECF Nos. 2, 11. He asserts that precautions to ensure that COVID-19 is not spread through the inmate population have not been implemented and claims that because of his age (71), he is at increased risk of death or serious illness as a result. *Id.*

Defendants filed a response to the Court's Order to Show Cause outlining the precautions implemented by the Maryland Division of Correction in response to the COVID-19 pandemic. ECF No. 8. Defendants claim that the precautions are adequate, and that Plaintiff cannot prevail in this matter because he has not exhausted administrative remedies regarding his claim. *Id*. Plaintiff was directed to respond to Defendants' assertions, ECF No. 10, and he alleges that he has been denied access to the administrative remedy procedure because WCI is on lockdown, the library is closed, and he is denied forms for filing an appeal of any administrative remedy procedure complaint ("ARP") he files, ECF Nos. 12 and 13. The issue regarding Plaintiff's

entitlement to injunctive relief is ripe for consideration; a hearing is not required. *See* Local Rule 105.6 (D. Md. 2018).

**I.     Background**

    **A.     Plaintiff's Allegations**

This case was opened upon receipt of Plaintiff's Motion for Temporary Restraining Order (ECF No. 2) as well as documents construed as a complaint (ECF No. 1). The "complaint" consists of an ARP filed by Plaintiff on November 28, 2020, asserting that "WCI Custody and Housing officials were not prepared in H.U. 2, B (COVID-19) virus outbreak." ECF No. 1 at 1. He claimed that dietary workers were COVID-19 positive, but there was no medical alert in housing unit 2, tier B, where he is housed. *Id*. According to Plaintiff, the housing unit should have been placed on medical quarantine following a "sudden outbreak." *Id*. He further claims that the housing unit was not sanitized, placing his life at risk. *Id*. He adds that "a number of inmates" tested positive for COVID-19, but their cells were not cleaned before inmates were moved into the cells. *Id*. at 2-4. As relief he sought to have the housing unit "completely closed" while a "full (COVID-19) cleaning" is performed and one-million dollars in damages.[1] *Id*. at 2.

The "complaint" was accompanied by a Motion for Temporary Restraining Order (ECF No. 2) in which Plaintiff sought to be removed from his housing unit because it was "contaminated." *Id*. at 1. He explained that he is 71 years old, inmates in his housing unit tested positive for COVID-19, the cells where inmates who became ill were not sanitized, and other inmates are put into the cells even though they were not cleaned. *Id*. at 2.

---

[1] This is the only mention of monetary damages Plaintiff makes and the request was directed to the Warden in his ARP. Nothing else Plaintiff has filed indicates that he is seeking anything other than injunctive relief.

Plaintiff also complains that the dietary department was completely shut down after dietary staff tested positive for the virus and he was being fed "ice cold box food." ECF No. 2 at 2. He claims he was not being given the same meals as other inmates. *Id*. He also claims that his housing unit (2-B-Tier) was quarantined because of the dietary workers who tested positive, but that he never tested positive and was required to be quarantined with the inmates who were ill. *Id*. Plaintiff argues that he is entitled to be moved out of the housing unit and that there is no legitimate interest in keeping him confined with COVID-19 positive inmates who pose a threat to his health. *Id*. at 3.

### B.     Defendants' Response

Defendants explain that WCI is a maximum-security institution consisting of five stand-alone housing units with a maximum capacity of 1752 inmates. ECF No. 8-3 at 1, ¶ 3 (declaration of Acting Warden Ronald Weber). Housing units 1, 2, 3 and 5 have four separate tiers that can house between 72 and 96 inmates; housing unit 4 has three separate tiers that can house between 72 and 96 inmates. *Id*. There is also a 25-bed infirmary. *Id*.

On March 12, 2020, "regular inmate visitation was suspended." ECF No. 8-3 at 2, ¶ 6. The following day all schools and shops were closed so there were limited interactions between inmates in different housing units. *Id*. On March 16, 2020, the Department of Public Safety and Correctional Services ("DPSCS") suspended all intakes from local jails, and any inmate scheduled to be transferred to WCI was screened and, upon arrival, was quarantined for fourteen days. *Id*. On March 19, 2020, religious activities held in the prison chapel were suspended and inmates were permitted to engage in religious activities in their cells or the recreation halls in their housing units. *Id*. On April 3, 2020, WCI started broadcasting religious services to the inmate population over "the inmate television." *Id*.

On April 6, 2020, the inmate population began receiving their meals in their cells. ECF No. 8-3 at 2, ¶ 7. Recreation was also limited to a maximum of 12 inmates per top and bottom tier to maintain social distancing guidelines issued by the Centers for Disease Control ("CDC"). *Id*. Medications were also distributed to inmates in their housing units. *Id*. Correctional staff were issued masks as personal protective equipment on April 6, 2020. *Id*. at ¶ 8. The inmate population was issued masks on April 20, 2020; they are required to wear the masks properly any time they leave their cells. *Id*.

Initial COVID-19 testing of correctional staff was completed between August 17 and 19, 2020 and has been repeated monthly since that time. ECF No. 8-3 at 1, ¶ 4. Staff members who test positive for the virus "are required to staff off site, undergo medical treatment, [and] not return to work until they provide medical documentation clearing them to return to work." *Id*. Additionally, positive test results for staff are "reported to the Occupational Health & Safety for contract tracing and monitoring." *Id*. Contact tracing serves the purpose of notifying, screening, and monitoring any person who meets the definition for close contact with someone who tests positive for COVID-19. *Id*. at 2, ¶ 4. Mass testing of the inmate population at WCI was conducted in June and "serial testing began in August 2020 with 72 inmates being tested weekly." ECF No. 8-3 at 2, ¶ 5.

Any staff member who reports to work with a temperature of 100.4 degrees, or who exhibits or reports flu-like symptoms, is not permitted entrance into WCI, and the case is reported to Occupational Health and Safety for review. ECF No. 8-3 at 2, ¶ 9. Inmates who have flu-like symptoms must be evaluated by medical staff as soon as possible. *Id*. at 3, ¶ 10. Sick call slips are used by the inmate population to request medical attention. *Id*.

Quarantine and isolation cells are located in housing unit 4, C tier. ECF No. 8-3 at 3, ¶ 11. Inmates who test positive for COVID-19 are moved to the isolation cells and if the COVID-19 positive inmate had a cell partner, he is quarantined, monitored for symptoms, and remains quarantined until medically cleared. *Id*. When an entire tier of a housing unit has had high positive test rates, the entire tier is quarantined or isolated. *Id*. at ¶ 12. The decision to quarantine or isolate an entire tier is made by medical staff. *Id*. When a tier is quarantined or isolated, inmates are only allowed to leave their cells for showers or telephone use, and movement is limited to one cell per upper and lower tier at a time. *Id*. Inmates may not leave the tier unless it is for a medical purpose and remain quarantined or isolated until medical staff decide the tier can return to normal. *Id*.

With respect to cleaning and sanitizing the prison's housing units and other areas, Defendants maintain that each tier is swept, mopped, and walls are wiped down twice a day. ECF No. 8-3 at 3, ¶ 14. The lobby and bathrooms are cleaned, and those walls are wiped down three times a day. *Id*. The housing unit showers are cleaned twice per day in general population and three times a day in segregation units. *Id*. The cleaning process utilizes a bleach solution or "correctpac germicidal solution." *Id*. While individual cells are cleaned once a week, the correctpac germicidal solution is available for any additional cell cleaning upon request. *Id*. The medical department's "walls, windows, and door handles are cleaned a minimum of 3 times [a day] with bleach solution and mopped once per shift." *Id*. Food service equipment is cleaned and sanitized after every use. *Id*. Additionally, WCI utilizes third-party vendors to deep clean and sanitize the medical department, dietary department, receiving and ID, and inmate housing units monthly. *Id*. at 3, ¶ 15.

On May 11, 2020, the DPSCS COVID-19 Environmental Compliance Safety audit took place at WCI. ECF No. 8-3 at 4, ¶ 16. As a result of the audit, additional signs were posted in

designated isolation and quarantine areas. *Id*. Additional audits that took place on July 31, September 16, and November 9, 2020 found WCI to be in full compliance with required safety measures. *Id*., *see also id.* at 5-20 (audit reports).

With regard to Plaintiff specifically, he is serving a life-sentence, making him ineligible for early release. *Id*. at ¶ 17. Plaintiff has never tested positive for COVID-19.[2] *Id.* at ¶ 18.

As noted, Defendants assert that Plaintiff has failed to properly exhaust administrative remedies regarding his claims. They note that since 2009, Plaintiff has filed 33 ARP appeals. ECF No. 8-4 at 1, ¶ 2 (Decl. of Kristina Donnelly, Special Assistant to Dep. Sec. for Operations). A search for appeals of ARPs to the Commissioner of Correction that concern the topics raised in Plaintiff's complaint found that there were no records of an appeal "germane to the above-captioned case." *Id*. at ¶ 3. Additionally, no record of an appeal to the Inmate Grievance Office ("IGO") could be located. ECF No. 8-5 at ¶¶ 2-3 (Decl. of F. Todd Taylor, Dir. Of IGO). Defendants do not provide an index of the ARPs filed by Plaintiff with descriptions of the subject matter covered in each ARP.

### C.     Plaintiff's Reply

Plaintiff states that he has filed ARPs but states that he has been prevented from filing an appeal to the Commissioner because officers at WCI are "unwilling to pass out ARP forms upon request." ECF No. 12 at 2. He adds that unless he is able to go to the library, he cannot get the appropriate form to file an ARP appeal. *Id*. The library, however, is closed. *Id*. at 2-4. He further implies that if he avails himself of the ARP process, he risks being placed into administrative

---

[2]     As of November 20, 2020, which was the most recent test at the time of the response on December 21, 2020. ECF No. 8-3 at 4.

segregation indefinitely. *Id*. at 5. He does not, however, claim that this has occurred in his case. *Id*.

Plaintiff takes aim at Defendants' response calling it repetitious and claims that "illness and death has repeated at a rapid pace . . . proper medical standards [have] fallen." ECF No. 13 at 2. Plaintiff places little to no value on the "copies of official documents" provided by Defendants and asserts they are simply procrastinating on the issue. *Id*. His focus remains on the adequacy of sanitizing cells that were once occupied by inmates who were ill with COVID-19 and he maintains the procedure for sanitizing cells is not followed. *Id*. at 3. He cites an example of "another prisoner" dying "recently" from "cross contamination," meaning that the inmate was put into a cell that was not adequately cleaned, contracted COVID-19 because of it, and ultimately died. *Id*. at 5-6. He states that the information provided by Defendants is outdated because it relates back to early March of 2020. *Id*. at 6. He states Defendants continued to broadcast false information claiming that there was nothing to fear, but then began testing inmates who exhibited symptoms and later inmates who were higher risk. *Id*. In Plaintiff's view, the testing had "no set medical pattern" and was not "properly coordinated." *Id*.

Plaintiff also maintains that WCI is overcrowded and COVID-19 is a "major factor" of whether a person lives or dies while in segregation, which he states is the "last stop for medical consideration." ECF No. 13 at 7. He claims that as of December 21, 2020, the population at WCI was 1752 if not higher. *Id*. It is Plaintiff's opinion that COVID-19 patients should be assigned to single cells to reduce the spread of the virus. *Id*. He adds that inmates who are moved into a cell with another inmate are not given any medical information about the cell partner and questions how long a non-positive inmate can remain healthy if he is put into a cell with a cellmate who is

positive for the virus. *Id*. at 7-8. He does not allege that any of this has occurred in his case. *Id*. at 8.

Notwithstanding Plaintiff's stated concerns about exposure to the virus, he also complains about the extended period of time he and other inmates are confined to their cells, noting that in the one-hour per day they are allowed out of their cells they must shower and make phone calls. *Id*. at 8. He further complains that they are not provided access to outdoor air or sunshine which he describes as "extreme." *Id*. at 8-9.

As relief, Plaintiff seeks an Order from this Court requiring: WCI to reduce its inmate population to allow for single occupancy cells for quarantining COVID-19 positive inmates; all housing units and cells to be "completely sanitized" by workers supervised by medical staff; cleaning supplies to "be exchange[d];" notification when an inmate dies of COVID-19; and any cell housing an inmate who dies to be shut down and fully sanitized. *Id*. at 10-11. Plaintiff takes issue with the lack of information provided by Defendants regarding inmate deaths from COVID-19 and apparently does not believe that information is confidential medical information. *Id*. at 11-12.

**II.    Standard of Review**

"An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), *see also SAS Institute, Inc. v. World Programming Lmtd*, 874 F.3d 370, 385 (4th Cir. 2017) (satisfying four-prong test is "a high bar, as it should be."). A party seeking a preliminary injunction or temporary restraining order must establish the following elements: (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the party's favor; and (4) why the injunction is in the public interest.

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *The Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346–47 (4th Cir. 2009). As to irreparable harm, the movant must show the harm to be "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Medical Group,* 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted). In the prison context, courts should grant preliminary injunctive relief involving the management of correctional institutions only under exceptional and compelling circumstances. *See Taylor v. Freeman*, 34 F.3d 266, 269 (4th Cir. 1994).

An additional consideration is required when injunctive relief is sought in the context of prisoner civil rights case. Under 18 U.S.C. § 3626(a)(2):

> In any civil action with respect to prison conditions, to the extent otherwise authorized by law, the court may enter a temporary restraining order or an order for preliminary injunctive relief. Preliminary injunctive relief must be narrowly drawn, extend no further than necessary to correct the harm the court finds requires preliminary relief, and be the least intrusive means necessary to correct that harm. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity set out in paragraph (1)(B) in tailoring any preliminary relief. Preliminary injunctive relief shall automatically expire on the date that is 90 days after its entry, unless the court makes the findings required under subsection (a)(1) for the entry of prospective relief and makes the order final before the expiration of the 90-day period.

*Id*. Application of this standard to the instant case requires me to deny Plaintiff's requests for injunctive relief as explained below.

### III. Discussion

#### A. Exhaustion of Administrative Remedies

As noted, Defendants raise an affirmative defense that Plaintiff has not exhausted administrative remedies. As a prisoner, the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, requires Plaintiff to exhaust administrative remedies prior to filing an action in court concerning prison conditions. Specifically, the provision states that:

9

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e (h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F. Supp. 2d 523, 528 (D. Md. 2003), *aff'd*, 98 F. App'x 253 (4th Cir. 2004).[3]

Notably, administrative exhaustion under § 1997e (a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner. Rather, the failure to

---

[3] Maryland appellate case law indicates that the administrative grievance procedure does not encompass "'every kind of civil matter that could be brought by a DOC inmate.'" *Massey v. Galley*, 392 Md. 634, 646, 898 A.2d 951, 958 (2006) (citation omitted). Rather, it applies only to matters that "relate to or involve a prisoner's 'conditions of confinement.'" *Id*. at 651, 898 A.2d at 960 (citation omitted). Thus, the grievance procedure does not apply to requests for public information under the Maryland Public Information Act, *see id*., nor does it apply to medical malpractice claims against private medical service providers who treat inmates under contract with the DOC. *See Abramson v. Correctional Med. Servs., Inc*., 359 Md. 238, 753 A.2d 501 (2000).

Moreover, the administrative grievance procedure does not apply to claims for compensation for disabilities resulting from "personal injury arising out of and in the course of [an inmate's] work for which wages or a stipulated sum of money was paid by a correctional facility," Md. Code Ann. Corr. Servs. § 10-304, for which a claim to a different administrative body, the Sundry Claims Board, is the exclusive remedy. *See Dixon v. DPSCS*, 175 Md. App. 384, 927 A.2d 445 (2007). On the other hand, the grievance process does apply to a wide variety of claims that arise out of the conditions of confinement, even if the grievance process cannot provide a comprehensive remedy for such claims, such as tort claims of assault and battery against prison officers. *See McCullough v. Wittner*, 314 Md. 602, 552 A.2d 881 (1989).

exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendants. *See Jones v. Bock*, 549 U.S. 199, 215-216 (2007); *Anderson v. XYZ Correctional Health Services, Inc.*, 407 F.2d 674, 682 (4th Cir. 2005). Nevertheless, a claim that has not been exhausted may not be considered by the court. *See Bock*, 549 U.S. at 220. In other words, exhaustion is mandatory. *Ross v. Blake*, __ U.S. __, 136 S. Ct. 1850, 1857 (2016). Therefore, a court ordinarily may not excuse a failure to exhaust. *Ross*, 136 S. Ct. at 1856 (citing *Miller v. French*, 530 U.S. 327, 337 (2000) (explaining "[t]he mandatory 'shall'. . . normally creates an obligation impervious to judicial discretion")).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. *Moore v. Bennette*, 517 F.3d 717, 725, 729 (4th Cir. 2008); *see Langford v. Couch*, 50 F. Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he . . . PLRA amendment made clear that exhaustion is now mandatory."). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006). This requirement is one of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Woodford*, 548 U.S. at 93 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (emphasis in original). But the court is "obligated to ensure that any defects in [administrative] exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).

An inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e (a). In *Ross*, 136 S. Ct. at 1855, the Supreme Court rejected a "freewheeling approach to exhaustion as inconsistent with the PLRA." *Id*. In particular, it rejected a "special circumstances" exception to the exhaustion

11

requirement. *Id*. at 1856-57. The Court reiterated that "[a] prisoner need not exhaust remedies if they are not 'available.'" *Id*. at 1855. "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore,* 517 F.3d at 725 .

An administrative remedy is available if it is "'capable of use' to obtain 'some relief for the action complained of.'" *Ross*, 136 S. Ct. at 1859 (quoting *Booth*, 532 U.S. at 738). Thus, an inmate must complete the prison's internal appeals process, if possible, before bringing suit. *See Chase*, 286 F. Supp. 2d at 529-30. As a prisoner, Plaintiff is subject to the strict requirements of the exhaustion provisions. *See Porter*, 534 U.S. at 528 (no distinction is made with respect to exhaustion requirement between suits alleging unconstitutional conditions and suits alleging unconstitutional conduct). Exhaustion is also required even though the relief sought is not attainable through resort to the administrative remedy procedure. *See Booth*, 532 U.S. at 741.

There are three circumstances when an administrative remedy is unavailable and an inmate's duty to exhaust available remedies "does not come into play." *Ross,* 136 S. Ct. at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id*. The third circumstance arises when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

Here, Defendants assert that Plaintiff failed to appeal any of the ARPs he filed concerning conditions at WCI since the onset of the pandemic. Plaintiff counters that the forms for seeking

an appeal of the Warden's decision are not available to inmates because officers will not hand them out and because the inmate library is closed. ECF No. 12. I find that the record evidence does not support a finding that Plaintiff had the full range of the administrative remedy procedure available to him and that this likely caused his inability to exhaust same. Therefore, the merits of Plaintiff's claim are addressed below.

### B. Eighth Amendment Claim

Conditions which "deprive inmates of the minimal civilized measure of life's necessities" may amount to cruel and unusual punishment. *Rhodes v. Chapman*, 452 U. S. 337, 347 (1981). However, conditions which are merely restrictive or even harsh, "are part of the penalty that criminal offenders pay for their offenses against society." *Id*.

> In order to establish the imposition of cruel and unusual punishment, a prisoner must prove two elements - that 'the deprivation of [a] basic human need was *objectively* sufficiently serious,' and that '*subjectively* the officials acted with a sufficiently culpable state of mind.'

*Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995) (emphasis in original) (citation omitted).

Importantly, neither Plaintiff nor this Court is responsible for implementing daily operational decisions involved with managing Maryland's prisons. *See Sandin v. Conner*, 515 U.S. 472, 482-83 (1995) (it is not the province of the courts to determine how a particular prison might be more beneficently operated). This maxim is clearly illustrated by the circumstances of this case where a world-wide pandemic has crippled the operations of every private and public institution in this country and abroad. Further, the standards for how best to contain the spread of the virus are evolving on a daily basis, and most appropriately are influenced by the views of medical and public health experts, rather than courts and litigants. As the Eleventh Circuit has noted:

> Perhaps especially in the prison context, government officials have a keen interest in maintaining the necessary flexibility to react quickly in response to new information about the virus. The district court therefore erred in failing to consider the 'damage [its] proposed injunction may cause' the defendants.

*Swain v. Junior*, 961 F.3d 1276, 1293 (11th Cir. 2020) quoting *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1247 (11th Cir. 2016).

While Plaintiff's fears and concerns are understandable, they do not open a gateway for this Court to superintend the daily activities of WCI as requested by Plaintiff. His claims consist of generalized allegations that suppose worst-case-scenarios that are not supported by the record before me. Plaintiff does not allege that he has incurred an actual injury due to the lack of precautions he suggests should be implemented. Thus, Plaintiff is not entitled to injunctive relief both because he is unlikely to succeed in this case and because issuance of an injunction does not serve a legitimate public interest.

A separate Order denying Plaintiff's Motions for Injunctive Relief and dismissing the complaint follows.


April 15, 2020_____                      _____/S/_____
Date                                        Paul W. Grimm
                                            United States District Judge